IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROSALINE M. TUCKER, | ) | |
| | ) | |
| Plaintiff, | ) | 15 C 4924 |
| | ) | |
| v. | ) | Judge John Z. Lee |
| | ) | |
| THC-CHICAGO, INC., d/b/a | ) | |
| KINDRED-CHICAGO-CENTRAL | ) | |
| HOSPITAL, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Rosaline Tucker ("Tucker") has sued Defendant THC-Chicago, Inc., d/b/a Kindred-Chicago-Central Hospital ("Kindred"), pursuant to 42 U.S.C. § 1981, alleging she was terminated from her position as a registered nurse because she is African-American. Kindred now moves for summary judgment. For the reasons that follow, Kindred's motion [54] is granted.

### Background[1]

Kindred-Chicago-Central Hospital is located on Chicago's Northwest Side and provides "aggressive, specialized interdisciplinary care to medically complex patients who require extended recovery time." Def.'s LR 56.1(a)(3) Stmt. ¶¶ 2–3, ECF No. 56. Tucker worked at Kindred and its predecessors from 1994 until her termination in 2012. *Id.* ¶ 4. Tucker is from Sierra Leone and identifies her race as

---

[1] All facts in this section are undisputed unless noted otherwise.

Black. *Id.* ¶¶ 6–7. In fall 2010, she suffered a stroke, but she returned to work in 2011. *Id.* ¶¶ 29, 31.

The parties agree that, prior to the events leading up to her termination, Tucker provided patient care that was generally satisfactory and at times excellent. Def.'s Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 1, 3, ECF No. 68. Tucker claims that her level of care earned her great respect at the hospital, both among patients, who called her "Mama Rose," and nurses, who called her "Rose of Kindred." Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 1–2, ECF No. 65.

Beginning in May 2012, a series of incidents occurred that caused Kindred to discipline Tucker for what it perceived to be care-related misconduct. First, on May 23, 2012, Tucker was given a written warning for failing, on four different occasions in a two-month period, to properly complete documentation related to the administration of narcotic medications. Def.'s LR 56.1(a)(3) Stmt. ¶ 35. The written warning listed several different errors that Tucker committed from April through May 2012, including failing to record the patient's name, the dosage given, or whether a dosage was wasted and the reason for waste. *Id.*; *see id.*, Ex. C, at 7, ECF No. 56-4. The warning also noted Tucker's failure to sign the documentation and to verify by signature that a dosage was wasted. *Id.* Tucker acknowledged the written warning with her signature and wrote, "floor was busy with a rush at all times but hope to improve." *Id.* ¶ 36; *see id.*, Ex. C, at 8.

For her part, Tucker denies that she failed to complete the necessary narcotics documentation on the four different days. Pl.'s LR 56.1(b)(3)(B) Stmt ¶ 35,

2

ECF No. 64.[2] She maintains that, on at least one occasion, she threw a sheet in the trash and intended to fill out a clean sheet in accordance with what she states is hospital policy, only to have a co-worker retrieve the sheet from the garbage and give it to management. Def.'s LR 56.1(a)(3) Stmt. ¶¶ 38–40.

On May 23, 2012, Tucker was also given a final written warning based on her care of a certain patient ("Patient X"), who later died. *Id.* ¶ 42. The warning charged that Tucker had failed to adequately monitor Patient X's blood sugar levels and to ensure that a physician-ordered IV solution was infusing in a prompt manner. *Id.* Tucker, however, refused to acknowledge the warning with her signature. *Id.* ¶ 44. She maintains that she checked Patient X's blood sugar at appropriate intervals given the number of patients she was asked to care for at the time. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 46. As for the IV solution, Tucker claims that she was merely following the orders of Patient X's primary care doctor, and thus should not have been faulted for any delay. *Id.* ¶¶ 42–43.

Then, on July 9, 2012, Tucker was discharged after she failed to sign another narcotics sheet on June 27, 2012. Def.'s LR 56.1(a)(3) Stmt. ¶¶ 54, 57.[3] Although

---

[2] In her statement of additional facts, Tucker makes the blanket assertion that she "followed [Kindred's] procedures and practices and properly completed all documentation regarding narcotics." Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 23. But this position (which Tucker does not pursue in her briefing) is belied by her response to Kindred's facts and her own acknowledgement of her errors.

[3] Between May 23 and July 9, Tucker received a verbal warning for failing to sign a crash cart checklist at the end of her shift. Def.'s LR 56.1(a)(3) Stmt. ¶ 50. Tucker admitted that she did not sign the chart because it was a busy day and she forgot. *Id.* ¶ 51. But Tucker argues that she did not deserve the warning. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 52. This incident, however, was not a stated basis for her termination, and the Court need not consider it further.

Tucker admits that she did not sign the narcotics sheet, she claims that she had an agreement with another nurse, Winona, to sign on her behalf, *id.* ¶ 58, and that a nurse supervisor had approved this arrangement, Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 29.

Bruce Carey made the decision to terminate Tucker. Def.'s LR 56.1(a)(3) Stmt. ¶ 54. The decision to terminate her was based on her numerous narcotics documentation errors and the deficient care she provided to Patient X. *Id.* ¶¶ 54–55; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 32.[4] At her termination meeting, Carey also noted that he was concerned about Kindred losing its narcotics license as a result of Tucker's many errors. Def.'s LR 56.1(a)(3) Stmt. ¶ 59.

Tucker believes that her termination was not warranted and suggests that she should only have been suspended. *Id.* ¶ 60; *see* Pl.'s LR 56.1(b)(3)(B) Stmt ¶¶ 54–55. She further asserts that the real reason for her termination was her race, her national origin, and the disability she experienced from her stroke. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 40.

## **Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

---

[4] Tucker makes much of the fact that she did not cause Patient X's death, a fact that Kindred concedes. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 6, 8. Furthermore, although Denise Kreuter, another Kindred official, told Tucker that she was being terminated for causing Patient X's death, Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 4, the parties agree that this was not the basis for Tucker's termination. Moreover, while Tucker indicates at times that she believes that Denise Kreuter was the one who terminated her, Tucker does not dispute that Bruce Carey alone made the termination decision, and thus it is his decision-making that is relevant here. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 54. *Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1015 (7th Cir. 2004).

4

as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012). In reviewing a motion for summary judgment, the Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). The Court must not make credibility determinations or weigh conflicting evidence. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

## Analysis

When Kindred filed its motion for summary judgment, the Seventh Circuit had not yet decided *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). In *Ortiz*, the Seventh Circuit elaborated upon the approach that district courts should take in evaluating discrimination claims. Eschewing "the rat's nest of surplus 'tests'" that had developed to evaluate such claims, *id.* at 765–66, the court refocused the inquiry on "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 765. Under this inquiry, "[e]vidence must be considered as a whole," regardless of whether it is "direct" or "indirect" in nature (and without reference to those terms).

5

*Id.* Still, the burden-shifting framework under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), remains a valid (but nonexclusive) method of proving a Title VII claim.[5] *Id.* at 766; *see David*, 846 F.3d at 224. Moreover, while *Ortiz* specifically addressed Title VII claims, claims under § 1981 are subject to the same requirements as claims under Title VII, and thus are also governed by *Ortiz*'s mode of analysis. *Smart v. DHL Express (USA), Inc.*, No. 15-CV-1598, 2017 WL 449178, at *3 (N.D. Ill. Feb. 2, 2017).

On this basis, in evaluating whether Tucker's claims survive summary judgment, the Court will consider evidence she presents as a whole. In doing so, the Court will consider whether she has made out a *prima facie* case under the traditional *McDonnell Douglas* framework. Ultimately, however, the Court will focus on the more general inquiry of whether a reasonable jury could find that Kindred terminated her employment because of her race. *See Pearson v. Ill. Bell Tel. Co.*, No. 15 C 653, 2016 WL 7374235, at *6 (N.D. Ill. Dec. 20, 2016) (adopting a similar approach in the wake of *Ortiz*).

I. **Discrimination Based on Race**

An initial problem confronting Tucker's § 1981 claim is her own deposition, during which she repeatedly testified that she was discriminated against because of

---

[5] Under this framework, a plaintiff makes out a prima facie case of discrimination by showing: "'(1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employer['s] legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer.'" *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017) (alteration in original) (quoting *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014)).

her national origin and disability, rather than race. *See Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756 (7th Cir. 2006) (observing that a § 1981 claim is limited to race-based discrimination).

In an initial exchange, Tucker explained as follows:

Q: When you went to the EEOC . . . you thought Kindred had discriminated against you?

A (Tucker): Yes.

Q: Because you were black?

A: Yes.

Q: Okay.

A: You know, *because of my disability and because of my place of origin*.

Q: Okay.

A: I told them that. But the EEOC say [sic], no, they cannot put that, they have to put race because that covers all of that, [so] that's what I give [sic] to them.

Def.'s LR 56.1(a)(3) Stmt., Ex. E, at 23:21–24:7, ECF No. 56-6 (hereafter "Pl.'s Dep.") (emphasis added).

Later, Tucker reflected again on her meeting with the EEOC:

Q: Okay. So do you remember meeting with someone from the EEOC and them asking you questions about why you thought you were terminated . . . ?

A: I mean, talking about termination. I went there one time and met with a girl. And then that's when—like I was telling you, that's when she said that place of origin was not an issue and she—she took that off. And she said race is the same as place of origin, *which I don't think, you know, it was* [sic] *true.*

*Id.* at 30:15–25 (emphasis added).

And near the end of her deposition, Tucker repeated her reasons for going to the EEOC and pursuing this action. After observing that "[a]fter [her] stroke, that's when all the problems started," she elaborated:

> A: So for me it was prejudice. I don't care how you twist it, it is prejudice.
>
> Q: So you—
>
> A: Okay. You know, okay, prejudice because of my disability and prejudice because of my place of origin. And I told that to the Department of Human Services,[6] and the girl said, no, you cannot put prejudice because of your place of origin. *We have to put there* [sic] *race. She change* [sic] *that. I never gave her that race.* Race and, you know, you say race is part of your place of origin. I said, fine. So she put it on there, okay. After I had the stroke, my problem start [sic] zooming . . . .
>
> . . . .
>
> Q: So your—
>
> A: So that's what I was fired for.
>
> Q: The—
>
> A: After the stroke.
>
> Q: So it was—you're saying that your termination was based on your—
>
> A: Disability.
>
> Q: —disability and—
>
> A: —and my—

---

[6] Tucker presumably meant the EEOC. There is no indication that she pursued claims with the Department of Human Services, and this exchange relates back to her earlier discussion of what she told the EEOC.

> Q: —place—
>
> A: —place of origin.

*Id.* at 306:9–307:19 (emphases added).

Tucker ignores this testimony in her briefing. She does not attempt to explain it, nor does she contest its accuracy. In her response to Kindred's Local Rule 56.1 statement of facts, in which Kindred states, "Tucker believes Kindred's termination was based on national origin and disability," Def.'s LR 56.1(a)(3) Stmt. ¶ 63, Tucker replies: "Disputed. Tucker was discriminated against because of my [sic] race (Black)." Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 63. In support, she cites to a section of her deposition testimony, which says nothing to this effect. Tucker also points to her declaration, but it cannot be used to controvert her unambiguous testimony on summary judgment. *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67–68 (7th Cir. 1995).[7] Finally, she cites to a declaration by Kelechi Onugha-Erimako, but she was never previously disclosed to Kindred and, therefore, cannot present evidence in opposition to the motion. *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 669 (7th Cir. 2012).

Based upon the above, Kindred contends that summary judgment is warranted because there is no genuine dispute in this case over whether Tucker believes she was discriminated against because of her race. This argument has some appeal. But the Seventh Circuit has instructed that courts should "consider

---

[7] Tucker has not attempted to argue that any of the exceptions to this rule (such as her testimony being mistaken due to vague questioning, or her memory having lapsed) apply in this instance. *Id.* at 68. Even if she had, there is no indication of vague questioning or a lapse in memory.

the matter of race broadly" under § 1981. *Pourghoraishi*, 449 F.3d at 757 (citing *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 611–12 (1987); *see also Abdullahi v. Prada USA Corp.*, 520 F.3d 710, 712 (7th Cir. 2008).[8] Here, given Tucker's deposition testimony that she was discriminated against she was "black," and construing all reasonable inferences in her favor, the Court declines to grant summary judgment on this basis.

Kindred also appears to argue that Tucker's § 1981 claim must be rejected because she testified that she was also discriminated against because of her disability. Section 1981 does not provide redress for discrimination based upon disability. *See Clement v. Satterfield*, 927 F. Supp. 2d 297, 307 (W.D. Va. 2013) (granting summary judgment against a § 1981 plaintiff who claimed at his deposition he was discriminated against based on disability, not race). But again, granting Tucker every reasonable inference of the record, a reasonable jury could conclude that the basis of her claim is race discrimination. Accordingly, the Court will proceed to evaluate Tucker's claim under *McDonnell Douglas* and *Ortiz*.

## II. Similarly Situated Employees

In an effort to present similarly situated employees, Tucker identifies four nurses as comparators—Esther Mateo, MaryAnn Canillo-Zamora, Sally Malisga, and Darlene Wojdyla. According to Tucker, all of these nurses are not African-American and committed errors like Tucker, but were not terminated. Pl.'s Resp.

---

[8] In *Pourghoraishi*, the Seventh Circuit held that an Iranian plaintiff could state a claim for race discrimination under § 1981, despite testifying that he was "white." 449 F.3d at 757. The court eschewed "definitions of race that require distinctive physiognomy" and "strict adherence to taxonomical, biological, and anthropological definitions" of race. *Id.*

Opp'n Summ. J. 10, ECF No. 64; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 33. Identification of similarly situated comparators is an essential element of a *prima facie* case under the *McDonnell Douglas* framework and remains a relevant consideration in the wake of *Ortiz*. *See David*, 846 F.3d at 226–27; *Williams v. Office of Chief Judge of Cook Cty.*, 839 F.3d 617, 626–27 (7th Cir. 2016) (holding failure to identify a similarly situated employee was "fatal" to plaintiff's discrimination claim).

As Tucker acknowledges in her response, similarly situated individuals must (1) deal with the same supervisor, (2) be subject to the same standards, and (3) have "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Pl.'s Resp. at 10 (citing *Gates v. Caterpillar*, 513 F.3d 680, 690 (7th Cir. 2008)). Here, Tucker cannot show that the three nurses engaged in the same pattern and level of misconduct that caused her termination. For example, Mateo was given a final written warning for failing to follow blood culture orders and related errors in regard to caring for one patient on one day. Pl.'s Exs., Ex. 5, at 3, ECF No. 66-5. But she was never disciplined for any documentation errors, like Tucker, nor is there any evidence that she had committed the number or frequency of errors as Tucker. Canillo-Zamora received a verbal warning and a subsequent written warning for disposing of narcotics without properly documenting the disposal and having another nurse witness the disposal, *id.*, Ex. 5, at 5, but the record indicates this incident was an isolated one, and there is no indication Canillo-Zamora had any patient care issues. The same applies to Malisga, who was

11

evidently disciplined for failing to sign a narcotics sheet. *Id.*, Ex. 1, ¶ 24. There is nothing in the record that demonstrates that Malisga committed as many documentation errors as Tucker or was disciplined for any patient care issues. Finally, Wojdyla's infraction for failing to review or sign a crash cart checklist, *id.*, Ex. 5, at 7, was not the type of infraction that resulted in Tucker's termination.

Where a plaintiff is terminated for repeated misconduct and identifies comparators who have engaged in only isolated misconduct, the comparators cannot be said to be similarly situated. *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 366 (7th Cir. 2009); *see also Hurst v. Ball Mem'l Hosp., Inc.*, No. 1:05-CV-877JDTTAB, 2007 WL 1655794, at *5 (S.D. Ind. June 1, 2007) (holding that nurses who had not committed as many purported medication errors were not similarly situated to the plaintiff nurse, who had committed more). Additionally, where a plaintiff engages in misconduct more severe than her proffered comparators, her comparators are not similarly situated. *Jones v. City of Joliet*, No. 07C2691, 2010 WL 747695, at *3 (N.D. Ill. Mar. 2, 2010) (collecting cases).

Accordingly, Tucker has not identified any similarly situated nurses outside her protected class, who had engaged in similar misconduct, but were not terminated.

### III. Pretext

Assuming, for the purposes of argument, that Tucker has identified similarly situated comparators, she has nevertheless failed to demonstrate that Kindred's

12

stated reasons for her terminating her were pretextual.[9] Under the *McDonnell Douglas* framework, a plaintiff must demonstrate that an employer's legitimate, stated reasons for taking an adverse employment are pretextual. *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 892 (7th Cir. 2016). To demonstrate pretext, Tucker must point to evidence from which a reasonable jury could conclude that Kindred's stated reasons for terminating her were "phony" or a "lie." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). If Kindred's stated reasons for terminating Tucker were phony or a lie, she might then show that the real reason for her termination was her race. *See id.* Pretext, however, is different from mistake. *Id.* "[A] party establishes pretext with evidence that the employer's stated reason [f]or the employment decision 'was a lie—not just an error, oddity, or oversight.'" *Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 661 (7th Cir. 2013) (quoting *Van Antwerp v. City of Peoria*, 627 F.3d 295, 298 (7th Cir. 2010)).

Here, Tucker does not dispute that when she was terminated, Kindred's stated reason for doing so was her narcotics documentation errors and her failure to provide adequate treatment for Patient X. Def.'s LR 56.1(a)(3) Stmt. ¶ 54; Def.'s LR 56.1(b)(3)(C) Stmt. ¶ 32. Rather, she focuses primarily on the underlying incidents giving rise to her termination and offers various reasons for why she believes she

---

[9] Similarly, Tucker has not demonstrated that she was meeting Kindred's legitimate expectations at the time she was terminated, because she has not shown that Kindred's reasons for finding she was not meeting those expectations were pretextual. *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179–80 (7th Cir. 1997).

13

should not have disciplined. None of these reasons, however, supports a finding of pretext.

First, in regard to her initial warning for narcotics documentation errors, Tucker argues that she was "unjustly written up for throwing away a narcotics sheet with errors and using a clean one, when it was common and accepted practice to do so." Pl.'s Resp. at 8. As a preliminary matter, this argument misstates the reason for the discipline, which was based on failing to properly complete (as opposed to throwing away) narcotics documentation. Def.'s LR 56.1(a)(3) Stmt. ¶ 35; *id.*, Ex. D, ¶ 3. Tucker further alleges, however, that the only reason Kindred came into possession of some of her erroneous documentation is because another employee fished it out of the trash. Pl.'s Dep. at 41:14–42:9. But her basis for this allegation is that "someone whisper[ed] in [her] ears" what her co-worker had done. *Id.* Accordingly, insofar as this allegation could provide any support of pretext (and it is unclear how), it is based entirely on hearsay. *See, e.g.*, *Gordon*, 674 F.3d at 774.

Next, regarding her write-up for the care she gave Patient X, Tucker maintains that she failed to check Patient X's blood sugar regularly because the floor on which she worked was too busy at the time. Pl.'s Resp. at 7. She also contends that she did not ensure Patient X's fluid was promptly infusing because of instructions she had received from Patient X's primary care doctor. *Id.* at 8. Indeed, the parties dispute whether Tucker checked Patient X's blood sugar a sufficient number of times and whether Tucker followed proper procedure in changing Patient X's fluid. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 42–47. But even

assuming the truth of Tucker's version of events, the most that could be reasonably inferred from the evidence is that Kindred erred in disciplining her. And an employer's erroneous belief, held in good faith, is insufficient to support a claim of race discrimination. *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 465 (7th Cir. 2014) ("The question is not whether [Kindred's] assessment of [Tucker's] performance was correct, only that it was an honest belief and not a pretext for [racial discrimination]."); *see also Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 471 (7th Cir. 2000) ("[I]t is not . . . the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee.").

Finally, with respect to the narcotics documentation error that precipitated her termination, Tucker explains that another nurse, Winona, had agreed to sign the narcotics documentation on her behalf. Pl.'s Resp. at 9. Tucker further claims that she told a nurse supervisor that Winona would sign the form, and the supervisor approved the agreement. *Id.* The fact remains, however, that for whatever reason, Winona did not abide by her part of the deal. Def.'s LR 56.1(a)(3) Stmt. ¶ 58. No one signed the narcotics documentation, and Tucker was disciplined as a result. Even if a nurse supervisor had acquiesced to the agreement, the agreement fell through, and Tucker has provided no evidence from which a reasonable jury might conclude that Tucker was disciplined due to her race, rather than the failure to sign the paper documentation.[10]

---

[10] Tucker's claim that she received permission from a nurse supervisor to have Winona sign the document is based on the unnamed nurse supervisor's out-of-court statement and appears to be hearsay. Tucker has provided no reason why it should be admissible, although it might constitute a statement by a Kindred employee under Federal Rule of

15

Additionally, Tucker present several more general arguments for why she believes Kindred's reasons for terminating her were pretextual. First, she argues that Kindred deviated from its progressive discipline policy by imposing written and final warnings on her on the same day. But Kindred's policy expressly permitted deviation in instances of serious performance issues, which Tucker does not dispute. Def.'s LR 56.1(a)(3) Stmt. ¶ 26. In such circumstances, pretext cannot be inferred. *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 541 (7th Cir. 2007). What is more, Tucker's own exhibits reference a nurse outside of Tucker's protected class who had engaged in particularly serious misconduct that justified a similar departure from the hospital's progressive discipline policy. Pl.'s Exs., Ex. E, at 8; *see* Def.'s App'x, Ex. A, at 10–11, ECF No. 56-2.

Tucker further asserts that she was not shown documents relating to her termination when she was terminated and that there was no investigation of the charges against her. Pl.'s Resp. at 9. But neither argument is sufficient to establish pretext. Tucker does not argue that the incidents and disciplinary warnings leading up to her termination were created after the fact. *Cf. Pillay v. Millard Refrigerated Servs., Inc.*, No. 09-CV-5725, 2012 WL 4498221, at *13 (N.D. Ill. Sept. 28, 2012) (finding that documentation created after plaintiff's termination

---

Evidence 801(d)(2)(D). For its part, Kindred is willing to concede the truth of the nurse supervisor's statement, Reply at 7 n.9, ECF No. 67, but notes the Court's discretion to find the statement inadmissible given that Tucker raised the statement for the first time in her affidavit in opposing summary judgment. *Gates*, 513 F.3d at 688 n.5 (explaining that where an affidavit provides new, specific information that a party did not mention in a prior deposition, and the circumstances are such that it should have been mentioned, it is within the district court's discretion to disregard it).

gave rise to an inference of pretext). Nor does the mere fact that she was not presented with a document summarizing the existing reasons for her termination— reasons which were verbally explained to her—support a finding of pretext. Additionally, Tucker's general complaint of insufficient investigation does not suggest dishonesty on Kindred's part. *Little*, 369 F.3d at 1013 (holding that general allegations that an employer's investigation into the reasons for termination was "shoddy" was a "nonstarter" in attempting to establish pretext). In any case, Tucker does not dispute that she appealed her termination within Kindred's internal system, and that it was affirmed. Def.'s LR 56.1(a)(3) Stmt. ¶ 62.

Finally, the fact that the hospital's regional director wished to reinstate her, Pl.'s Resp. at 10, does not indicate pretext. The relevant inquiry is whether Kindred's stated reasons for terminating her were mere lies to cover up racial discrimination. The fact that the hospital's regional director—who was not the decisionmaker who terminated her—later wished to reinstate her does not indicate that Kindred's reasons for terminating her were dishonest. *Little*, 369 F.3d at 1015 ("The analysis of pretext focuses only on what the decisionmaker, and not anyone else, sincerely believed.").

## IV. Evidence as a Whole

Finally, even though no reasonable jury could find that Tucker was discriminated against based on her race under the *McDonnell Douglas* framework, the Court will consider whether, under *Ortiz*, a reasonable jury could nevertheless find that her termination was based on her race. A reasonable jury could not. Her

past performance at the hospital, even if exemplary, is irrelevant to the question of whether Kindred's reasons for disciplining her are true. *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014) ("The question is not whether she ever satisfied [Kindred's] expectations, but whether she met [Kindred's] expectations at the time she was fired."). The similarly situated non-Black nurses she has identified are not similarly situated; if anything, they show that Tucker's performance errors were more severe when compared to other nurses. And while she makes various arguments that might call the wisdom of Kindred's practices or disciplinary measures into doubt,[11] none suggest that she was terminated based on her race, rather than the various performance-related errors that Kindred relied upon in firing her.

Not only is there no evidence from which a reasonable jury could conclude Kindred terminated Tucker because of her race, but no reasonable jury could ignore the evidence that undermines Tucker's claim. As discussed above, Tucker admitted at her deposition that she thinks her national origin and disability, and not her race, were the basis for her firing. Tucker further admits that no one ever made racist comments to her. Def.'s LR 56.1(a)(3) Stmt. ¶ 28. Every indication is that Tucker had a long, largely satisfactory term as a nurse at Kindred until she committed a rapid series of narcotics documentation and care-related errors that resulted in her termination. Tucker argues that these errors were justified for one

---

[11] In her statement of additional facts, Tucker lays various charges that Kindred discriminates based on race in the manner it assigns nursing staff. These conditions, however, are not the basis of her claim, nor does she connect them in any way to the incidents at issue in this case. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 24–25.

reason or another. She believes that the proper response by Kindred would have been only to suspend her. But whether Tucker's actions are properly considered errors and whether the discipline for them was proportionate is not for the Court to decide. The most Tucker could persuade a factfinder is that Kindred did not evaluate her performance correctly and punished her too harshly for her various errors. But such mistakes in an employer's judgment are not actionable under § 1981. And based on the evidence, no reasonable jury could conclude that Tucker was terminated because of her race.

## **Conclusion**

For the foregoing reasons, Kindred's motion for summary judgment [54] is granted.


**IT IS SO ORDERED.**          **ENTERED**    3/31/17

_____
**John Z. Lee**
**United States District Judge**